IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

JOHN ROBERT SMITH, SHIRLEY HALL,
and GENE WALKER                                                                              PLAINTIFFS

VS.                                                           Civil Action No. 3:01-cv-855-HTW-DCB

DELBERT HOSEMANN, Secretary of State of Mississippi;
JIM HOOD, Attorney General for the State
of Mississippi; HALEY BARBOUR, Governor
of Mississippi; MISSISSIPPI REPUBLICAN
EXECUTIVE COMMITTEE; and MISSISSIPPI
DEMOCRATIC EXECUTIVE COMMITTEE                                              DEFENDANTS

and

BEATRICE BRANCH, RIMS BARBER,
L. C. DORSEY, DAVID RULE, JAMES
WOODARD, JOSEPH P. HUDSON, and
ROBERT NORVEL                                                                                INTERVENORS

CONSOLIDATED WITH

KELVIN BUCK, ET AL.                                                                          PLAINTIFFS

vs.                                                           Civil Action No. 3:11-cv-717 HTW-LRA

HALEY BARBOUR, ET AL.                                                                DEFENDANTS

MEMORANDUM OPINION

This matter is before us on the motion of the Mississippi Republican Executive Committee ("MREC") to amend the final judgment we entered on February 26, 2002. That judgment implemented the four-district congressional redistricting plan we adopted in our order of February 4, 2002, and ordered use

No. 3:01-CV-855HTW-DCB

of the court-drawn plan in every succeeding congressional primary and general election for the State of Mississippi until the State produced a constitutional and precleared plan of its own. To date, the State of Mississippi has not produced such a plan and, thus, every congressional primary and general election in Mississippi since February 26, 2002, has occurred under the court-drawn plan.

In 2010, the federal government conducted the usual decennial census, which indicated that the four districts in the court-drawn plan are now malapportioned. The MREC urges us to amend our final judgment to equalize the malapportioned districts in order to comply with the constitutional requirement of one person, one vote.

At a status conference on November 22, 2011, we advised the parties that we would defer ruling on this motion until after December 4, 2011, which was the deadline for the Mississippi Legislature's Standing Joint Congressional Redistricting Committee (the "Committee")[1] to present a reapportionment plan to the Governor and the Legislature. As we have emphasized throughout this litigation, the primary responsibility for reapportionment lies with the State of Mississippi; if the State of Mississippi can timely reapportion the districts in a constitutionally acceptable manner, the federal courts have no duties to draw the district lines. Once it became clear that the State of Mississippi could not have a precleared redistricting plan in place by January 13, 2012 (the deadline to qualify for candidacy for the United States House of Representatives in Mississippi, *see* Miss. Code Ann. § 23-15-299), we concluded that this court should assert its jurisdiction and craft a plan for reapportioning Mississippi's

---

[1] Under Miss. Code Ann. § 5-3-123, "[t]he members of the [C]ommittee shall draw a plan to redistrict, according to constitutional standards, the United States congressional districts for the state of Mississippi no later than thirty (30) days preceding the convening of the next regular session of the legislature." Miss. Code Ann. § 5-3-123. The next regular session of the Mississippi Legislature after the release of the census data is set to convene on January 3, 2012.

2

congressional districts in order to assure that the congressional election scheduled under the laws of the State of Mississippi is timely implemented under a plan that satisfies both the requirements of the Constitution and Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c.

I.

The facts and procedural history of this case are set out in our previous orders and opinions. *See Smith v. Clark*, 189 F. Supp. 2d 503 (S.D. Miss. Jan. 15, 2002); *Smith v. Clark*, NO. 3:01-CV-855WS (S.D. Miss. Feb. 19, 2002). In order to resolve the issues presently before us, we necessarily set out additional background facts.

On February 26, 2002, we entered a final judgment in this case that enjoined the use of Mississippi's then existing five-district congressional plan because the number of congressional representatives allotted to the state had been reduced from five to four as a result of the 2000 Decennial census. The five-district plan remains codified at Miss. Code Ann. § 23-15-1037, however. Our final judgment provided as follows:

> For the reasons stated in our opinions of February 19, 2002, and February 26, 2002, the defendants are hereby enjoined from implementing the congressional redistricting plan adopted by the Chancery Court for the First Judicial District of Hinds County, Mississippi.
>
> It is further ordered that the defendants are enjoined from implementing the former five district congressional redistricting plan codified at Miss. Code Ann. § 23-15-1037.
>
> It is further ordered that the defendants implement the congressional redistricting plan adopted by this court in its order of February 4, 2002, for conducting congressional primary and general elections for the State of Mississippi in 2002.
>
> It is further ordered that the defendants shall use the congressional redistricting plan adopted by this court in its order of February 4,

No. 3:01-CV-855HTW-DCB

> 2002, in all succeeding congressional primary and general elections for the State of Mississippi thereafter, until the State of Mississippi produces a constitutional congressional redistricting plan that is precleared in accordance with the procedures in Section 5 of the Voting Rights Act of 1965.
>
> This court shall retain jurisdiction to implement, enforce, and amend this order as shall be necessary and just.

*Smith v. Clark*, 189 F. Supp. 2d 548, 559 (S.D. Miss. Feb. 26, 2002), *aff'd sub. nom.*, *Branch v. Smith*, 538 U.S. 254 (2003). Since we entered this final judgment, the Mississippi Legislature has failed to produce any redistricting plan, let alone one that has obtained federal preclearance from either the United States District Court for the District of Columbia or the United States Department of Justice as required under Section 5 of the Voting Rights Act. As a result, under the terms of the final judgment, every subsequent congressional primary and general election has occurred under the four-district plan drawn by this court.

The federal government has now completed the 2010 Decennial census. Although the results of the census do not change the State of Mississippi's number of congressional representatives, the four districts now stand malapportioned because of population shifts among the districts. Thus, if these same districts are utilized in subsequent congressional primary and general elections, voters' rights will be violated under the Constitution and the Voting Rights Act.

On June 27, 2011, the Chairman of the MREC, Arnie Hederman, gave notice to the Mississippi Secretary of State, under Miss. Code Ann. § 23-15-1085, that the Republican Party intends to hold a presidential primary in 2012. Under Section 23-15-1085, the Secretary of State has the duty to "issue a proclamation setting every party's congressional and senatorial primary elections" for the date required by statute. *Id.* The presidential primary, set by Section 23-15-1081,

No. 3:01-CV-855HTW-DCB

91  will be held on March 13, 2012, and under Section 23-15-1083, the party
92  primaries for members of the United States House of Representatives will be
93  held on the same day.  And, under Section 23-15-299, candidates seeking to run
94  for a congressional seat must qualify with the appropriate State Executive
95  Committee sixty days before the primary date, which in this presidential election
96  year will be January 13, 2012.
97  Asserting that the Mississippi Legislature had not produced a
98  constitutionally acceptable and precleared congressional redistricting plan , and
99  that it was not likely to do so before the qualifying date of January 13, 2012, the
100 MREC filed a motion on September 12, 2011, requesting that we amend our final
101 judgment under Federal Rule of Civil Procedure 60(b)(5) on the ground that
102 applying the judgment prospectively is no longer equitable.  Specifically, the
103 MREC argued that there is no likelihood the Mississippi Legislature – which has
104 not adopted a congressional redistricting plan since 1991 – will adopt a plan by
105 statute, obtain the Governor's signature, and obtain preclearance approval,
106 between the time the Legislature convenes on January 3, 2012, and the
107 qualifying date of January 13, 2012.  Accordingly, the MREC requested that we
108 modify the final judgment, to satisfy the Constitution and the Voting Rights Act.
109 The Smith Plaintiffs and Governor Haley Barbour[2] joined in the MREC's motion.
110 Attorney General Jim Hood[3] filed a response on September 29, 2011,
111 objecting to the MREC's motion on the grounds that it is premature, that the
112 MREC lacks standing, and that this court lacks authority under Rule 60(b)(5)
113 to amend the judgment.

---

[2] Under Fed. R. Civ. P. 25(d), Governor Haley Barbour is substituted for former Governor Ronnie Musgrove.

[3] Under Fed. R. Civ. P. 25(d), Attorney General Jim Hood is substituted for former Attorney General Mike Moore.

5

On October 10, 2011, Secretary of State Delbert Hosemann[4] filed his response. He contended the legislative Committee should be allowed until December 4, 2011, to present a plan. In the event the Committee did not meet its deadline, Secretary Hosemann urged this court to "take whatever action it deems necessary" to insure the completion of the redistricting process by January 13, 2012. According to Secretary Hosemann, an untimely redistricting process could result in a special election at a cost to Mississippi taxpayers of approximately $750,000.

On October 12, 2011, the Intervenors filed a response, arguing that redistricting should be addressed in a new lawsuit.

On November 8, 2011, we ordered the parties to appear for a status conference on November 22, 2011. On November 21, a class-action complaint was filed by seven African-American voting age persons representing each of the state's four congressional districts (hereinafter the "Buck Plaintiffs"). The Buck Plaintiffs seek a declaratory judgment that the existing redistricting plan contains malapportioned districts violating one person, one vote. They submit their own plan and seek injunctive relief enjoining congressional elections to be conducted under their proposed plan.

On November 29, 2011, Chief Judge Jones of the Fifth Circuit appointed the members of this court to serve as the members of the three-judge district court to hear and resolve the Buck Plaintiffs' lawsuit under 28 U.S.C. § 2284. On December 7, the Buck Plaintiffs filed an amended complaint asserting the same allegations and requesting identical relief. On December 19, we entered an order consolidating the Buck Plaintiffs' lawsuit with the initial case in the interest of judicial economy and conflict preclusion.

---

[4] Under Fed. R. Civ. P. 25(d), Secretary of State Delbert Hosemann is substituted for former Secretary of State Eric Clark.

During the status conference on November 22, 2011, the parties iterated the arguments made in their responses to the MREC's motion.[5] After the hearing, we saw no hope that the Mississippi Legislature would produce a timely plan. We explained, however, that we would take no action until the December 4, 2011, deadline had passed for a proposed plan to be produced by the Committee. If the Committee failed to act timely, however, we informed the parties that we would move forward with drawing a new plan in order to have a final plan in place by January 13, 2012. We requested that the parties submit comments on the plan submitted by the Buck Plaintiffs by December 12, 2011.

As anticipated, the Committee did not produce a plan by December 4, 2011. Thus, on December 6, in order to insure the timely election of congressional representatives, this court ordered the MREC to purchase redistricting software for the court to use in drafting a proposed plan reapportioning Mississippi's four congressional districts. In accordance with the terms of that Order, the MREC delivered the software to this court on December 8.

On December 12, 2011, we received various responses and criticisms to the Buck Plaintiffs' plan. Relevant to the question of our authority to act under Rule 60(b)(5), Attorney General Hood said that he no longer objects to this court modifying the final judgment, although he characterizes it as a "last resort."

On December 19, 2011, this court filed its proposed plan, attached hereto as an appendix. Included in the order were the factors considered in drawing

---

[5] During the hearing, the Smith Plaintiffs proffered that they lived in the same districts as they did in 2002, when they filed the original complaint in this case. Attorney General Hood's argument that no one had standing to assert a one person, one vote challenge to the current plan was thus refuted. As no one disputes that all of Mississippi's four congressional districts stand malapportioned after the 2010 Decennial census, the Smith Plaintiffs' proffer is sufficient to establish their standing to initiate this challenge. Furthermore, the suggestion that the MREC, a defendant in this case, may not seek relief from the judgment under Rule 60(b)(5) is meritless.

161 the new plan, as well as an instruction to the parties that any and all objections,
162 comments, and suggestions to the new plan were to be submitted to the court by
163 December 22, 2011. On that date, no party objected to the proposed plan, nor
164 did any party have any comments or suggestions. In short, all parties accepted
165 the court-drawn plan.

166 II.

167 In explaining the action we have taken and are taking, we will first
168 address our authority to amend the final judgment under Rule 60(b)(5). We then
169 address our amendment of the final judgment in accordance with the December
170 19, 2011, order proposing a new congressional redistricting plan.

171 A.

172 As we have set out above, the MREC, joined by the Plaintiffs, Governor
173 Barbour, and Secretary Hosemann, have moved to amend the final judgment
174 entered on February 26, 2002, which, among other things, implemented the
175 current four-district plan adopted by this court in its order of February 2, 2002.
176 The basis for the motion to amend is that applying the judgment prospectively
177 is no longer equitable in the light of the currently malapportioned districts and
178 the applicable law. Although no party now challenges our authority under Rule
179 60(b)(5) to amend our final judgment, we *sua sponte* hold that, under Rule
180 60(b)(5), we have jurisdictional and procedural authority to amend the final
181 judgment and draw a new plan.

182 Under Rule 60(b)(5) a court, on motion and just terms, "may relieve a
183 party . . . from a final judgment, order, or proceeding" if applying the judgment
184 "prospectively is no longer equitable." The language is clear and authoritative.
185 To obtain relief, the movant must show that: "(1) the judgment has prospective
186 application and (2) it is no longer equitable that it should so operate." *Kirksey*
187 *v. City of Jackson*, 714 F.2d 42, 43 (5th Cir. 1983).

"Like the traditional equity rule on which it is based, [R]ule 60(b)(5) applies only to judgments that have prospective effect as contrasted with those that offer a present remedy for a past wrong." *Cook v. Birmingham News*, 618 F.2d 1149, 1152 (5th Cir. 1980) (internal quotation marks omitted). The phrase is not defined in the text of Rule 60(b)(5) or in its accompanying Advisory Committee Notes. Extrapolating from the Supreme Court's holdings in *Pennsylvania v. Wheeling & Belmont Bridge Co.*, 59 U.S. 421, 431 (1855), and *United States v. Swift & Co.*, 286 U.S. 106, 114, 114–15 (1932), however, the D.C. Circuit has held that "whether an order or judgment has prospective application within the meaning of Rule 60(b)(5) [depends on] whether it is 'executory' or involves 'the supervision of changing conduct or conditions.'" *Twelve John Does v. District of Columbia*, 841 F.2d 1133, 1139 (D.C. Cir. 1988). Under either definition of prospective application examined in *Twelve John Does*, our final judgment has prospective application.

First, the final judgment is executory by its terms. It *orders* the defendants to perform a future act, i.e., to use the court-drawn congressional redistricting plan in all succeeding elections. Although the order is in effect until the State of Mississippi produces its own plan, that does not undermine its executory character. Indeed, the Supreme Court of Mississippi has recognized that because the Legislature failed to produce a congressional redistricting plan, the State "is currently under a federal court injunction ordering that the State use the congressional districts drawn by the three-judge court," which "will remain in place *until* that court vacates it or the Legislature draws a redistricting plan which is then federally precleared under § 5." *Mauldin v. Branch*, 866 So.2d 429, 435–36 (Miss. 2003) (emphasis added).

Second, the final judgment requires this court to supervise changing conditions between the parties. *See Swift,* 286 U.S. at 114 ("The distinction is between restraints that give protection to rights fully accrued upon facts so

9

nearly permanent as to be substantially impervious to change, and those that *involve the supervision of changing conduct or conditions* and are thus provisional and tentative." (emphasis added)).  The conditions underlying the final judgment, the population of the districts, are not nearly so permanent as to be substantially impervious to change.  It is a fact of life that populations shift over time, and as a result, we are now required to supervise amendment of the final judgment on the basis of changed conditions.  Our express retention of "jurisdiction to implement, enforce, and amend [the] order as shall be necessary and just" supports our conclusion regarding the prospective nature of the final judgment. In *Cook v. Birmingham News*, the Fifth Circuit explained that the consent decree in question did not have prospective application, in part, because "unlike the district court that had approved the decree at issue in the *Swift* case, [the district court here] did not state that it *reserved power to modify the decree or that it retained jurisdiction* over the case.  It would have been natural for the decree to have contained such a provision if it had been intended that the court supervise the parties' compliance." *Cook*, 618 F.2d at 1153 (emphasis added) (internal citation omitted). Our language retaining jurisdiction in the final judgment, far from being superfluous as has been suggested, demonstrates that we intended to continue to supervise the parties' compliance with the order and any changed conditions that could make the defendants' compliance with the final judgment problematic.[6]  Indeed, we were effectively ordering a sovereign

---

[6] Our reservation of jurisdiction takes into account Judge Rubin's observations in footnote one in *Jackson v. DeSoto Parish School Board*, 585 F.2d 726 (5th Cir. 1978).  In *Jackson*, a class of African-America citizens challenged the constitutionality of a reapportionment scheme for the election of the parish police jury and the local school board, which had been formulated as a result of prior litigation. *Id.* at 728.  In footnote one of the opinion Judge Rubin stated:

> The plaintiffs might have moved under Rule 60(b)(5), F.R.C.P., for relief from the prior judgment on the grounds that it "is no longer equitable that the judgment should have prospective application."  Plaintiffs did not seek to

237 state in precise terms to perform, and to continue to perform, certain acts to
238 comply with the federal Constitution and statutes – no light thing for us or it.
239 It is not the sort of thing to say, then to cast aside and allow to rot in our
240 presence.
241       Now that we have determined that we have the power to amend or modify
242 the final judgment under Rule 60(b)(5) because the final judgment has
243 prospective application, we turn to the second question posed: whether legal or
244 factual circumstances have changed that make applying the final judgment
245 prospectively no longer equitable. "The party seeking to modify an injunction
246 bears the burden of establishing that a significant change in factual conditions
247 or the law warrants revision of the injunction." *United States v. Texas*, 601 F.3d
248 354, 373 (5th Cir. 2010) (citing *Rufo v. Inmates of the Suffolk Cnty. Jail*, 502
249 U.S. 367, 383–84 (1992)). It is undisputed that factual conditions have changed
250 since we entered the final judgment in 2002. The parties are all in agreement
251 that the results of the 2010 Decennial census show that the four districts are
252 now malapportioned, violating the constitutional one person, one vote

---

> overturn elections that took place under the challenged apportionment scheme, but to secure a modification of the plan before any more elections were held. A Rule 60(b) motion would have allowed the judge to consider within a single action all issues relating to the DeSoto Parish apportionment plan. We note, however, that in reapportionment, unlike school desegregation and institutional reform cases, the court's jurisdiction is not continuing, and the plan, once adopted and acted upon, does not require further judicial supervision.

*Id.* at 730 n.1 (internal citation omitted).

    This footnote is dicta in a case that did not present a question relating to Rule 60(b)(5). Even if it were not dicta the case does not bar our proceeding under Rule 60(b)(5) here because we expressly reserved jurisdiction, unlike the district court's original order in *Jackson*. Indeed, other courts have relied, in part, on this footnote to deny motions to amend in cases concerning reapportionment schemes, but again, our proceeding here is consistent with those courts to the extent they have relied on the absence of any express reservation of jurisdiction. *See Perry-Bey v. City of Norfolk, Va.*, 678 F. Supp. 2d 348, 382 (E.D. Va. 2009); *King v. State Bd. of Elections*, 979 F. Supp. 582, 590 (N.D. Ill.), *vacated on other grounds*, 519 U.S. 978 (1996).

Case 3:11-cv-00717-HTW-EGJ-DCB   Document 18   Filed 12/30/11   Page 12 of 18

No. 3:01-CV-855HTW-DCB

requirement. As the deadline for the Committee to submit a plan has passed, all parties agree that the plan must be modified and redrafted by this court in order to comply with the statutory deadlines for candidate qualifying and primary elections. Thus, we hold that the moving parties have demonstrated a significant change in factual conditions warranting revision of the final judgment.

B.

Accordingly, attached hereto is the court-drafted and party-accepted congressional redistricting plan for the State of Mississippi under the 2010 Decennial census. This court proposed this plan to the parties in an order entered on December 19, 2011. No party objected to the proposed plan.

At the status conference on November 22, 2011, all of the parties expressed a preference for using this court's current plan, with only such modifications as were necessary to equalize the population among the four districts. That is what we have done. All of the factors that we considered in crafting our previous plan, set out in our order of February 4, 2002, and our opinion of February 19, 2002, were taken into account in making the changes necessary to equalize population among the districts, except that we did not have to consider combining two existing districts, as we did ten years ago. The factors we considered are specifically addressed in the explanation accompanying the December 19, 2011 order and below.

C.

In drafting the plan, this Court considered many of the same factors that we considered when we drafted Mississippi's congressional redistricting plan ten years ago. During the past ten years, Mississippi's population grew from 2,844,658 to 2,967,297. That growth was not, however, consistent among the four congressional districts. The population of District 1 grew more than Districts 3 and 4, and District 2 lost population during the last ten years. In

281    order to equalize the population among the districts, approximately 46,000
282    people had to be removed from District 1; 27,000 people had to be removed from
283    Districts 3 and 4 (combined); and 73,000 people had to be moved into District 2.
284    Nevertheless, we made as few changes as possible to the current districts. Some
285    changes were inevitable, however. Yet, the core constituencies of each district
286    were substantially preserved, as reflected in the attached Core Constituencies
287    Report.
288        When the proposed map is compared to the 2002 Court Plan now in effect,
289    the major changes are summarized as follows:
290        Panola, Yalobusha, and Grenada Counties were moved from District 1 to
291    District 2. Leake County is no longer split between Districts 2 and 3, but the
292    entire county is now in District 2. Winston and Webster Counties are no longer
293    split between Districts 1 and 3, but they are entirely in District 1. We found it
294    necessary to split Oktibbeha County between Districts 1 and 3. Jasper County
295    is no longer split, but is now all in District 3. Marion and Jones Counties are no
296    longer split, but are wholly in District 4. Finally, Clarke County had to be split
297    between Districts 3 and 4.
298        All of these changes were necessary in order to equalize the population
299    among districts and to prevent retrogression in District 2, while maintaining the
300    research universities in separate districts and not extending travel distance
301    within the current elongated District 2. A retrogression inquiry under Section
302    5, by definition, requires a comparison of a jurisdiction's new voting plan with
303    its existing plan to determine whether the new plan preserves current minority
304    voting strength. Undermining the current exercise of the electoral franchise by
305    racial minorities would amount to "backsliding." This, the court cannot allow.
306    *Georgia v. Ashcroft*, 539 U.S. 461, 477-78 (2003).
307        Other minor changes were made in order to balance the population in
308    Districts 2 and 3, and to avoid splitting municipalities other than the City of

Jackson, which was split under the 2002 Court Plan. These changes include moving the Gluckstadt precinct in Madison County from District 2 to District 3. This change was necessary to avoid dividing the City of Madison, which annexed a portion of that precinct after the 2002 Court Plan went into effect. Two precincts in northern Madison County (Cedar Grove and Ratliff's Ferry) were moved from District 3 to District 2, and several precincts in the downtown Jackson area in Hinds County were shifted from District 2 to District 3, which already had a presence in the City of Jackson.

1.

Population Equality

The United States Constitution mandates a good-faith effort to ensure, as nearly as is practicable, that a State's congressional districts reflect equal population. This Court achieved substantial population equality while splitting only four of eighty-two counties and without splitting <u>any</u> precincts or any cities other than the City of Jackson, which already had been split under the 2002 Court Plan, with the approbation of Mayor Harvey Johnson.[7] The population deviation range is from +38 people in District 2 to -48 people in District 4. This slight deviation is de minimis, necessary, and acceptable in order to avoid dividing community interests, voter confusion and government expense that burdens the governments and the governed when counties and municipalities are split between congressional districts.

2.

Majority-Minority District

The Voting Rights Act requires that one congressional district in Mississippi be maintained with an appropriate majority of African-American voting-age residents. This district is represented on the map as District 2.

---

[7] We note that this Court is not required to adopt the preferences of politicians, but may consider any of their suggestions recognized by the jurisprudence of Section 5.

Under the 2002 Court Plan, African-Americans constituted 59.20% of the voting-age population. District 2 under the 2002 Court Plan now has an African-American voting-age population of 63.3%. Under this Court's proposed plan, African-Americans constitute 61.36% of the voting-age population in District 2. This result prevents retrogression of the voting rights of African-American residents of District 2 under Section 5 of the Voting Rights Act.

3.

Compactness

This Court has attempted to achieve, as nearly as possible, four compact districts. As we observed ten years ago, the ability to create compact districts is limited by the distribution of population and the need to prevent retrogression in District 2. Thus, sparsely populated districts necessarily will be geographically larger than heavily populated districts.

4.

County and Municipal Boundaries

The proposed plan splits only four counties: Hinds, Madison, Oktibbeha, and Clarke. Eight counties were split under this Court's 2002 plan. We think this fact is a significant improvement over the former plan.

The large population in Hinds and Madison Counties, as well as the need to prevent retrogression in District 2, necessitated the splitting of those counties between Districts 2 and 3. Clarke County is split only because it is necessary to equalize the population between Districts 3 and 4. Oktibbeha County is split to equalize the population in District 1 and to maintain a major university in District 3. The only municipality that is split is the City of Jackson, which was split under the 2002 Plan. Ten years ago, Mayor Johnson testified that he preferred that the City of Jackson be represented by two congressmen.[8] Because

---

[8] *See supra* footnote 7.

Jackson is the State's largest city, it would be difficult to devise a plan that does not split Jackson while at the same time respecting the one person, one vote principle and preventing retrogression in District 2.

5.

Historical and Regional Interests

The plan preserves as much as possible, given the constraints of population equality and Section 5 of the Voting Rights Act, the core historical and regional interests of the Mississippi River/Delta region, East Central Mississippi, Southwest Mississippi, North Mississippi, and the Gulf Coast region.

6.

Universities and Military Bases

The plan is drawn to continue to assure that the four major research universities are in separate districts. The military bases located in Lowndes, Lauderdale, and Harrison Counties remain in separate districts under this Court's plan.[9]

7.

Growth Areas

This Court has continued to make an effort to place the most rapidly growing areas of the State into separate districts as much as possible given the legal constraints that determine the configurations of each district.

8.

Incumbent Residences

---

[9] We note that this Court is not required to assure that the military bases and major research universities are in separate districts, but may consider this factor in drawing the districts.

Although we are not required to consider incumbent residences when drafting the plan, we observe that no incumbent would be required to move in order to run in the district in which he resides.

9.

Distance of Travel Within District

The distances of travel within the districts are approximately the same as they were under this Court's 2002 Plan. The new District 2 is geographically larger, but this result is unavoidable in view of the population deficit in District 2, occurring over the last ten years.

10.

Summary

This Court has attempted to apply all appropriate neutral factors that are recognized by the United States Supreme Court and federal redistricting courts, all of which we have noted above. We have tried to be particularly careful, first to honor the principle that this plan cannot permit any retrogression of the opportunity of minority voters to elect a representative of their choice. We have considered it a high priority not to split any precincts and to respect the counties as a unit of government and of the governed. Guided by these polestars, we have split counties, just a few, but only to attain equal population and to protect minority rights. We have also given our best efforts in respecting the community of interests of each district, although we recognize we have been constrained by legal requirements from perfectly achieving this goal. We have also been mindful of the present constituencies who have become accustomed to their districts and their representatives, and the importance of established relationships. Finally, we have respected the other considerations we enunciated earlier in 2002 and today in this order.

III.

No. 3:01-CV-855HTW-DCB

Having determined that the final judgment we entered on February 26, 2002 has prospective application and that the movants have shown a significant change in factual conditions warranting amendment of the final judgment, we hold that, under Rule 60(b)(5), the final judgment shall be amended in accordance with the order of December 19, 2011 and in accordance with this opinion.

Accordingly, the MREC's motion to amend is granted, and the Buck Plaintiffs' motion for preliminary and permanent injunctive relief is denied as moot. The congressional redistricting plan proposed by this court in its Order of December 19, 2011, shall be implemented for conducting congressional primary and general elections for the State of Mississippi in 2012, and in all succeeding congressional primary and general elections for the State of Mississippi thereafter, until the State of Mississippi produces a constitutional congressional redistricting plan that is precleared in accordance with the procedures in Section 5 of the Voting Rights Act of 1965.

This court shall retain jurisdiction to implement, enforce, and amend this judgment as shall be necessary and just.

SO ORDERED, this 30th day of December, 2011.

s/ E. Grady Jolly
E. GRADY JOLLY
UNITED STATES CIRCUIT JUDGE

s/ Henry T. Wingate
HENRY T. WINGATE
UNITED STATES DISTRICT JUDGE

s/ David C. Bramlette
DAVID C. BRAMLETTE
UNITED STATES DISTRICT JUDGE